IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 8, 2002 Session

**STATE OF TENNESSEE v. YEVETTE SOMERVILLE**

**Direct Appeal from the Circuit Court for Henry County**
**No. 13115     Julian P. Guinn, Judge**

---

**No. W2001-00902-CCA-R3-CD - Filed February 11, 2002**

---

The defendant, Yevette Somerville, was convicted of theft of property valued under $500, a Class A misdemeanor, and was sentenced to eleven months, twenty-nine days in the county jail. As her sole issue on appeal, the defendant argues that the State's failure to inquire about and preserve potentially exculpatory evidence violated her due process rights under the United States and Tennessee Constitutions. Having reviewed the entire record, we conclude that the loss of the evidence did not unfairly prejudice the defendant's case. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Victoria L. DiBonaventura, Paris, Tennessee, for the appellant, Yevette Somerville.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 10, 2000, a misdemeanor citation was issued, accusing the defendant of shoplifting at a Paris, Tennessee, Wal-Mart store and requiring that she appear in the Henry County General Sessions Court. Subsequently, the defendant was found guilty of theft of property valued under $500 by the general sessions court and was sentenced to eleven months, twenty-nine days, which was suspended to 120 days, and was ordered to pay a $1000 fine and $431.58 in restitution. She appealed the conviction to the Henry County Circuit Court, where a jury found her guilty of

theft of property valued under $500, a Class A misdemeanor. She was sentenced to eleven months, twenty-nine days to be served consecutively to her prior felony sentences.[1]

On January 10, 2001, the defendant filed a motion for a new trial, claiming insufficiency of the evidence and arguing that the State failed to inquire about or preserve a potentially exculpatory Wal-Mart surveillance videotape. The trial court stayed the motion for a new trial so that inquiry could be made as to the status of the videotape, which was recorded the day the defendant was accused of shoplifting.[2] Subsequently, the trial court overruled the motion for a new trial, and the defendant filed a timely notice of appeal.

The defendant provided the following Statement of Facts in lieu of a copy of the transcript from the Henry County Circuit Court proceedings:

> Majorie Gilley, an employee of Wal Mart, testified that, at approximately 3:25 in the afternoon on October 10, 2000, she saw the Defendant, Yevette Somerville, for the first time in the software department. She saw the Defendant pull a bag out of a shopping cart; walk over to the Co-Defendant, Sherry Tharpe, and hand her the empty bag; that Ms. Somerville had clothes folded on the sides of the shopping cart that she had removed from the hangers off the rack of clothing; that Ms. Tharpe handed the bag to Ms. Somerville and then turned away while Ms. Somerville put the folded clothes in the bag. If anyone drew near to where the two ladies were, the ladies would say 'red' as if it were a code. She also testified that Ms. Somerville was not giving the bags to Ms. Tharpe and that the two (2) ladies were no further than eight (8) to ten (10) feet apart at any given time. She testified that if people walked anywhere near the two (2) ladies, that Ms. Tharpe would say 'red' and the action would stop. The ladies moved in to several areas and changed areas whenever someone wearing a blue smock (a Wal Mart employee) came by and would say the word 'red.' They tied the bags up and then switched

---

[1] On July 26, 1999, the defendant, under Gibson County Circuit Court Docket No. 15650, pled guilty to attempt to possess a Schedule II controlled substance with intent to deliver, a Class D felony, and was sentenced to two years. On April 18, 2000, the defendant, under Henry County Circuit Court Docket No. 12998, pled guilty to delivery of a Schedule II controlled substance (.2 grams), a Class C felony, and was sentenced to four years, with 150 days to be served in confinement and the balance in community corrections. This sentence was ordered to be served consecutively to the two-year Gibson County sentence.

[2] The defendant argues on appeal that the trial court "ordered defense counsel to accompany the assistant district attorney to Wal-Mart to check the status of the tape." Actually, the trial court instructed, "I want you [referring to the prosecutor], and you take counsel with you, to familiarize yourself with that system, including the filing system." We do not interpret this instruction to mean that the prosecutor could not, himself, check on the status of the tape, as the defendant complains that he did, before he and defense counsel made a joint visit to Wal-Mart to ascertain whether the tape existed.

buggies in menswear; that Ms. Somerville stayed in menswear while Ms. Tharpe took her buggy out the front door. Ms. Gilley testified that she did not see Ms. Somerville talking to anyone else other than Ms. Tharpe. She said that Ms. Tharpe went to the car, put the bags in the car, and came back in to the store at which time she met up with Ms. Somerville in menswear. She also testified that she met up with the two (2) women near the front registers and testified, specifically, that "instead of leaving as I thought they were going to, they came back into the store." Most of the items taken were boys clothing, size 8, 10, 12, and 16. There was also some girls clothing taken, mostly in size 7 and 8.

Sherry Tharpe testified that she had been shoplifting for thirty (30) years; that she had been caught three (3) times; and all three (3) times she had been caught in Wal Mart. That she was on probation at the time of this shoplifting incident for shoplifting and for this crime, she received a sentence of 11 months and 29 days, all suspended but 120 days. That Yevette Somerville did not have any idea that Sherry Tharpe was going to steal or shoplift that day. Yevette Somerville had come by Sherry Tharpe's house earlier that day to ask her if she wanted to go to Wal Mart and Sherry said she did. While Yevette Somerville was helping the children in to the car, Sherry Tharpe prepared by putting used Wal Mart bags around her waist inside her clothing. Sherry Tharpe testified, in detail, how Yevette Somerville came by her house and was going Christmas shopping and asked Sherry if she wanted to go. Sherry Tharpe was getting ready and getting the children ready. She went in the kitchen and put the bags around her waist. Yevette Somerville did not see her do that and did not know she did that as Yevette was putting the children in the car. When they got to Wal Mart, each one of them got a shopping cart outside. The boy rides in a shopping cart and he uses a wheel chair. Both children were in Sherry's cart and Yevette had to go back to the car to get her billfold. Sherry and the children went on in to Wal Mart. Sherry went to the children's section and Yevette found her there. Sherry told Yevette she was shopping for her niece and nephew and her son. Yevette helped her pick out some clothing and make sets out of them. Boys size 8 and 9, boys size 9 and 10, and girls size 7. As Yevette matched the clothes up, she hung them over the sides of Sherry's shopping cart. When they were finished picking out the clothes for Sherry, Sherry asked Yevette to take the children and put them in Yevette's shopping cart. Yevette left the area to do her own shopping and Sherry insisted that Yevette take the children with her and told her she would find her later on. At no time during the period of time they were picking out the clothes did either

of them say the word 'red.' After Yevette left the area, Sherry took the bags out of her waist band and put the clothes in the bags. Then Sherry went out the front door and put the things in the car. She then went back in to the store to get the children and found Yevette Somerville in the toy section and tried to hurry Yevette out of the store but Yevette insisted on continuing her shopping, and finally gave in to Sherry's demands to go. Yevette was headed toward the check out counter to pay for her items. When the Wal Mart people stopped them for shoplifting, Sherry Tharpe told Ms. Gilley and the other Wal Mart people that Yevette had nothing to do with it. She also told the officer, Tony Elkins, that she did it on her own and Yevette Somerville had nothing to do with it.

Cleo Somerville testified that she saw Yevette Somerville at Wal Mart that day in the card section, but did not see Sherry Tharpe.

Patrice Tharpe testified that she saw Yevette Somerville at Wal Mart that day in the toy section with Sherry Tharpe's two (2) children, but she did not see Sherry Tharpe.

Yevette Somerville testified that she did not have any idea that Sherry Tharpe was going to steal or shoplift that day. Yevette Somerville had come by Sherry Tharpe's house earlier that day to ask her if she wanted to go to Wal Mart and Sherry said she did. While Yevette Somerville was helping the children in to the car, she was unaware that Sherry Tharpe prepared by putting used Wal Mart bags around her waist inside her clothing. Yevette testified that she was arrested while at the register in the check out lane. When they got to Wal Mart, each one of them got a shopping cart outside. The boy rides in a shopping cart and he uses a wheel chair. Both children were in Sherry's cart and Yevette had to go back to the car to get her billfold. Sherry and the children went on in to Wal Mart. Sherry went to the children's section and Yevette found her there. Sherry told Yevette she was shopping for her niece and nephew and her son. Yevette helped her pick out some clothing and make sets out of them. As Yevette matched the clothes up, she hung them over the sides of Sherry's shopping cart. When they were finished picking out the clothes for Sherry, Sherry asked Yevette to take the children and put them in Yevette's shopping cart. Yevette left the area to do her own shopping and Sherry insisted that Yevette take the children with her and told her she would find her later on. At no time during the period of time they were picking out the clothes did either of them say the word 'red'. Sherry Tharpe then found Yevette Somerville in the toy section and tried to hurry Yevette out of the store but Yevette insisted

on continuing her shopping, and finally gave in to Sherry's demands to go. Yevette was headed toward the check out counter to pay for her items. When the Wal Mart people stopped them for shoplifting, Sherry Tharpe told Ms. Gilley and the other Wal Mart people that Yevette had nothing to do with it. She also told the officer, Tony Elkins, that she did it on her own and Yevette Somerville had nothing to do with it.

The record does not reflect that a request was made for the potentially exculpatory videotape.

## ANALYSIS

The defendant argues that "the failure of the State to provide exculpatory evidence to the defense violated the Defendant's right to a fair trial under the Due Process Clause of the Constitution." The State disagrees, claiming the following: the videotape was equally available to the defendant; the State had no duty to preserve the tape; and, even if the State did have a duty to preserve the tape, the breach is immaterial since the tape would not have been exculpatory and the State had sufficient evidence to convict the defendant without the tape.

### I. State's Duty to Preserve and Disclose Exculpatory Evidence

In California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413, 422 (1984), the United States Supreme Court discussed the nature of evidence the State has a duty to preserve:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (footnote and citation omitted). According to Trombetta, this court must consider whether the Wal-Mart videotape would "play a significant role in the suspect's defense." Id. Both the State and the defendant agree that the tape's contents may only be speculated about, including whether the defendant even appeared on the tape, since Wal-Mart subsequently taped over the footage recorded on October 10, 2000, the day of the offense. Since the tape was destroyed before the State or the defendant viewed its contents, it is clear that, from the perspective of the State, the tape did not possess "an exculpatory value that was apparent before the evidence was destroyed." Id. The exculpatory value of the tape is doubtful, since the record indicated the Wal-Mart cameras were primarily used to monitor the Wal-Mart cashiers at the check-out counters. Even if the tape did show the defendant approaching the check-out counter on October 10, 2000, this evidence would not necessarily have been exculpatory since the defendant could have completed the shoplifting

-5-

offense prior to approaching the check-out counter. In addition, it is doubtful that the tape was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. The tape was destroyed by Wal-Mart, and neither the State nor the defendant ever had possession or control of it at any time.

Previously, this court has held that "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983); Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). Additionally, the court held that the prosecution is not required to disclose "information which is not possessed by or under the control of the prosecution or another governmental agency." Id. (citing Banks, 556 S.W.2d at 90). Ultimately, the Marshall court held that the defendant "'must bear the responsibility of [his] failure to seek its discovery'" if the evidence is accessible to both the prosecutor and the defendant. Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985), cert. denied, 474 U.S. 1086, 106 S. Ct. 861, 88 L. Ed. 2d 900 (1986)).

The facts do not support the defendant's claim. First, the defendant, herself, could have obtained the Wal-Mart videotape before it was destroyed but did not. Second, the tape was never in the State's possession or control; it remained in Wal-Mart's control at all times prior to its destruction. Third, the tape was equally accessible to the State and the defendant. Accordingly, based on Trombetta and Marshall, we conclude that the State did not breach its duty to preserve evidence.

## II. Discussion of the Ferguson Factors

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), the Tennessee Supreme Court identified the considerations that should be utilized in ascertaining the effect of loss or destruction by the State of potentially exculpatory evidence in its custody. After considering a bad faith standard, the court ultimately applied a "balancing approach" comparable to the one used by the Delaware Supreme Court in Hammond v. State, 569 A.2d 81, 87 (Del. 1989). Id. at 917.

Under this "balancing approach," the court must first decide whether the State had a duty to preserve the evidence. Id. If so, and the State breached its duty, the court must then consider three factors:

   1. The degree of negligence involved;[3]

   2. The significance of the destroyed evidence, considered in light of
   the probative value and reliability of secondary or substitute evidence
   that remains available; and

---

   [3] This factor presumes negligence in the loss or destruction of the evidence. Should the proof show bad faith, the trial judge may consider such action as may be necessary to protect the defendant's fair trial rights.

3. The sufficiency of the other evidence used at trial to support the conviction.

Id. After the court applies these three factors to a case, it must determine whether a trial without the evidence at issue would be fundamentally fair. Id. If the trial would not be fundamentally fair, then the court may dismiss the charges against the defendant or take whatever other action that will protect the defendant's right to a fair trial. Id.

In the instant case, we need only answer the initial inquiry posed by Ferguson, whether the State had a duty to preserve the potentially exculpatory evidence. Since we have already held that the State did not have a duty to preserve evidence of the Wal-Mart videotape, our application of the Ferguson analysis ends. We conclude that the State did not have a duty to preserve the evidence of the videotape since it was equally available to the defendant and the State never had possession or control of the tape.

## CONCLUSION

Based upon the foregoing authorities and analysis, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE